# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
                                        )
**CHARLES MITCHELL,**                   )
                                        )
**Plaintiff,**                          )
                                        )
**v.**                                  )          **Civil Action No. 16-10679-DJC**
                                        )
**CAROLYN COLVIN,**                     )
**Acting Commissioner of Social Security,[1]** )
                                        )
**Defendant.**                          )
_____)


## MEMORANDUM AND ORDER

**CASPER, J.**                                                    **July 28, 2017**

## I.     Introduction

Plaintiff Charles Mitchell ("Mitchell") filed claims for disability insurance benefits ("SSDI") and supplemental security income ("SSI") with the Social Security Administration ("SSA"). R. at 8.[2]  Pursuant to the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Mitchell brings this action for judicial review of the final decision of the Acting Commissioner of the SSA ("Commissioner"),  D. 1, issued by Administrative Law Judge ("ALJ") Paul W. Goodale on September 26, 2014, R. at 20.  Before the Court is Mitchell's motion to reverse and remand the ALJ's decision denying SSDI and SSI benefits, D. 16, and the Commissioner's motion to affirm

---

[1] The Court notes that the current Acting Commissioner of Social Security is Nancy A. Berryhill.

[2] "R." refers to the administrative record, D. 13.

the ALJ's decision, D. 19.  For the reasons discussed below, the Court DENIES Mitchell's motion to reverse and GRANTS the Commissioner's motion to affirm.

## II.     Factual Background

Mitchell was 33 years old on his alleged onset date of January 1, 2005.  R. at 346.  Mitchell has a date last insured of December 31, 2012.  R. at 73.  He applied for SSDI and SSI benefits on the grounds that the following conditions render him unable to work:  depression, back injury, stress and partial blindness in the right eye.  R. at 87.

## III.    Procedural Background

Mitchell applied for SSDI and SSI benefits on or about May 9, 2013 and June 22, 2013, respectively.  R. at 240; R. at 252.  After initial review, Mitchell was denied SSDI and SSI benefits on September 16, 2013 and September 11, 2013, respectively.  R. at 83; R. at 97.  Mitchell was also denied SSDI and SSI benefits upon reconsideration on November 15, 2013 and filed a timely request for an ALJ hearing.  R. at 179; R. at 182.  This hearing was held on August 14, 2014.  R. at 8.  Because the Appeals Council denied review, the ALJ's decision constituted the final decision of the Commissioner with respect to Mitchell's claim.  R. at 1-3.

## IV.     DISCUSSION

### A.     <u>Legal Standards</u>

#### 1.     *Entitlement to SSDI and SSI*

The Social Security regulations define disability as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not

less than 12 months." 20 C.F.R. § 404.1505(a). The disability must be severe, rendering the claimant unable to perform any previous work or any other substantial gainful activity for which the claimant is qualified and exists in the national economy. 20 C.F.R. §§ 404.1505(a), 404.1511.

The Social Security regulations set out a five-step process that the Commissioner must use when determining whether an individual has a disability. 20 C.F.R. § 416.920. First, if the applicant is engaged in any substantial gainful activity, then the applicant is found "not disabled." Id. Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the applicant is found "not disabled." Id. Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the applicant is found "disabled." Id. Fourth, if the applicant's residual functional capacity ("RFC") renders them able to perform past relevant work, then the applicant is found "not disabled." Id. Fifth, if the applicant, given their RFC, education, work experience and age, is unable to do any other work that exists in the national economy, then he is found disabled." Id.

### 2. *Standard of Review*

The Court may affirm, modify or reverse a decision of the Commissioner upon review of the pleadings and record. 42 U.S.C. § 405(g). This review, however, is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). The ALJ's findings of fact are conclusive so long as they are supported by substantial evidence in the record. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla and such, as a reasonable mind might accept as adequate to support [the Commissioner's] conclusion." Camacho Lorenzo

v. Comm'r of Soc. Sec., 278 F. Supp. 2d 211, 214 (D.P.R. 2003) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)); see Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  The Court must adhere to these findings of fact "even if the record arguably could justify a different conclusion."  Whitzell v. Astrue, 792 F. Supp. 2d 143, 148 (quoting Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)).

To the contrary, the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citations omitted).  If the ALJ made a legal or factual error, this Court may reverse or remand such decision with instruction to consider new material evidence or to apply the correct legal standard.  Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (citation and quotations omitted); see 42 U.S.C. § 405(g).

### B.   Before the ALJ

#### 1.   Medical History

##### a)   Back Pain

Mitchell's medical records reveal that he is a long-time sufferer of lower back pain. R. at 347-48.  He first sought treatment for his back pain as early as October 2010 at the Boston Medical Center ("BMC").  R. at 444-45.  At that time, he attributed the pain to motion and extension following an attempt to get out of bed.  R. at 446.  The examining nurse noted that Mitchell was "ambulatory with steady gait" and seemed comfortable, but he described his back pain as "sharp" and rated it a ten on a scale of zero to ten.  R. at 445.

Mitchell again sought treatment at the BMC for back spasms following an airplane ride in June 2011 and was prescribed Flexeril and Motrin.  R. at 468-69.  He reported that he suffered

4

similar back spasms when working at U-Haul five years prior.  Id.  Mitchell also made visits to the BMC for his lower back pain in February 2012, July 2012 and June 2013.  R. at 346-47.

In October 2013, Dr. Xihuan Yan ordered x-rays of Mitchell's lower back, which showed "minimal degenerative changes of the lumbar spine characterized by facet hypertrophy at L4-5, L5-S1."  R. at 535.   Dr. Yan noted that these results did not raise any "red flags," but referred Mitchell to physical therapy to remedy his lower back pain.  R. at 542.

In April 2014, Dr. Brian McGeeney ordered a magnetic resource imaging ("MRI") of Mitchell's back.  R. at 551.  The results showed "mild facet degenerative changes" and "mild neural foraminal narrowing" at L3-L4.  Id.  They also revealed, at L4-L5, "a large broad based-disc bulge," "mild facet degenerative changes" and "crowding of the subarticular recess…with impingement of the traversing L5 nerve roots."  R. at 551-52.  Shortly thereafter, Mitchell was given a steroid injection.  R. at 555.

b)      Alcohol and Substance Abuse

Mitchell also has a history of alcohol and substance abuse, which was documented during visits to the BMC between 2009 and 2013.  See, e.g., R. at 400-01; R. 408-09; R. 472; R. 493.  On January 21, 2009, Mitchell presented to the emergency room at the BMC due to an assault and the nurse noted that he had alcohol in his system.  R. at 376-78.  Mitchell reported that he drank alcohol daily and smoked marijuana.  R. at 377-78.

Mitchell's history of alcohol and substance abuse was also noted on April 19, 2009.  R. at 381-82.  He went to the BMC complaining of a sore throat and vomiting and was diagnosed with "poisoning – food unspecified."  R. at 381; R. 383.  During his examination, he stated that he

drinks alcohol daily and had approximately six beers and two shots the day prior to seeking treatment.  R. at 382.

Mitchell requested alcohol detoxification treatment on July 20, 2009 at the BMC.  R. at 384.  His daily consumption of alcohol, use of tobacco and marijuana abuse were again documented at that time.  R. at 385.  Specifically, he stated that he had approximately 100 alcoholic drinks in a typical week.  R. at 387.

Mitchell's alcohol and substance abuse was also recognized during many subsequent visits to the BMC.  See, e.g., R. at 405; R. at 435.  For instance, during an April 17, 2010 emergency room visit, he reported that he began abusing alcohol and cocaine "years ago" and the nurse classified the abuse as "severe."  R. at 439.  Mitchell also reported participating in drug and alcohol rehabilitation programs.  See, e.g., R. at 409.

c)   Depression

Mitchell's depression resulted in numerous visits to the BMC between 2009 and 2013.  See, e.g., R. at 407-08; R. at 425; R. at 448.  The earliest such visit in the record is August 1, 2009, at which time he reported having attempted to overdose and burn himself.  R. at 404.  On that occasion, he explained that he felt depressed and suicidal on multiple occasions since losing his job seven months before.  R. at 405.

Mitchell also presented with depression during visits to the BMC on August 18, 2009, R. at 408-09, and March 21, 2010, R. at 423-26.  On April 3, 2010, Mitchell was admitted at the BMC due to a self-inflicted, superficial laceration to his left wrist and was placed on suicide watch.  R. at 428-29.   He was "tearful" and stated that his "moods are up and down."  R. at 429.   On

6

February 25, 2011, Mitchell was again admitted at the BMC because he was exhibiting aggressive behavior that posed a risk to his safety and the safety of others.   R. at 450.

d)   <u>Right-Eye Blindness</u>

In March 2013, Mitchell was seen at the BMC as a result of multiple stab wounds, including near his eyes.  R. at 487.  He reported that he had "decreased baseline vision in the right eye" due to a past motorcycle crash.  <u>Id.</u>

2.   *ALJ Hearing*

During the administrative hearing on August 14, 2014, the ALJ heard testimony from Mitchell and a vocational expert ("VE"), James F. Scorzelli, Ph.D.  R. at 8.  Mitchell testified that he started working at U-Haul in 1999.  R. at 46-47.  He stopped working there soon after he fell and injured his spine while at work.  R. at 46.  He stated that he was later employed at Auto Zone and stopped working there in 2008 due to his back pain.  R. at 44-45.  Since then, he has not attempted to seek other employment due to his persistent back pain and depression.  R. at 45.

Mitchell also testified that his depression causes him to have suicidal thoughts and feelings of apathy.  R. at 52.  He stated that he has difficulty concentrating and does not like to be in large crowds of people.  R. at 59-61.  Furthermore, he explained that he is in psychotherapy and is taking medications for his depression, but does not see these treatments as helpful to him.  R. at 53.  Rather, he believes that the only reason his is still alive is because of his two sons.  R. at 52-53.

Regarding his alcoholism, Mitchell testified that he significantly reduced his alcohol intake starting approximately two years ago and currently drinks less than a can of alcohol a day.  R. at 57-58.  He also stated that, as of approximately five years ago, he no longer smokes marijuana.  R. at 57.  He denied ever taking cocaine, heroin or other illegal substances.  <u>Id.</u>

Following Mitchell's testimony, the VE testified that a hypothetical person limited to light exertional work with Mitchell's age, education, work experience and specific functional limitations could not perform the past work of delivery driver and truck mechanic.[3]  R. at 63-65. The VE explained that, since these occupations are considered medium work, a hypothetical person limited to light exertional work is unable to perform them.  R. at 65.  The VE concluded that the same hypothetical individual would be able to engage in alternative work, including in the position of a mail clerk, which exists in significant numbers in the national economy.  R. at 66.

The ALJ posed a second hypothetical that was identical to the first, but with the added limitation that the individual would require a "sit/stand option," meaning there would be "the opportunity to stand after 20 to 30 minutes of sitting."  R. at 66-67.  The VE then noted that such an individual could perform the jobs of call-out operator, surveillance systems monitor and information clerk which all exist in significant numbers in the national economy.  R. at 67.

### 3.   The ALJ's Findings

At step one of SSA's five-step sequential evaluation process, the ALJ found that Mitchell had not engaged in substantial gainful activity since March 30, 2012.  R. at 11.

At step two, the ALJ concluded that Mitchell's following impairments were severe:  lower back strain, impaired vision in the right eye, depression and substance abuse disorder.  Id.

---

[3] Specifically, the ALJ asked the VE to:

"assume a person of the Claimant – with the Claimant's age, education and work experience, able to perform duties at the light exertional level, but with the following limitations. Could only occasionally stoop, crouch, crawl and kneel, occasionally climb ramps or stairs, not climb ladders, ropes, or scaffolds, could do . . . overhead reaching bilaterally. Should avoid exposure to workplace hazards . . . Could not work at a, at an occupation that requires acute vision and particularly on the right side."  R. at 65.

At step three, the ALJ determined that Mitchell did not have an impairment or combination of impairments that met or equaled a listing in 20 C.F.R. § 404, Subpart P, Appendix 1. R. at 11. The ALJ specifically considered whether Mitchell's back impairment met or equaled the listings under 1.00 (Musculoskeletal System) including 1.04 (Disorders of the spine). Id. The ALJ reasoned that Mitchell's medical records did not support a finding that his back impairment met or equaled one of the relevant listings. Id.

The ALJ additionally considered whether Mitchell's depression met or equaled listing 12.04 (Depressive, bipolar and related disorders). Id. However, the ALJ concluded that Mitchell's depression did not meet one set of either the "paragraph B" or "paragraph C" criteria as the listing required. R. at 11-12. In regards to the "paragraph B" criteria, the ALJ found that Mitchell had only mild restrictions in his activities of daily living, mild difficulties in social functioning and moderate difficulties with concentration persistence or pace. Id. The ALJ was unable to establish that Mitchell experienced any episodes of decompensation that were for an extended duration of time. R. at 12. As a result, the ALJ could not find that Mitchell's depression had one extreme limitation or two marked limitations out of the four areas of mental functioning recognized in "the B criteria" of listing 12.04. R. at 11-12. In regards to "the C criteria," the ALJ deemed the evidence insufficient to support a finding that Mitchell's depression was "serious and persistent" for at least a two-year period with evidence of treatment that diminishes his symptoms and a minimal capacity to adapt to environmental changes. R. at 12.

Before proceeding to step four, the ALJ concluded that Mitchell's RFC permitted him to perform light work. R. at 13. Nevertheless, Mitchell would require "a sit/stand option, in which he could stand after 20-30 minutes of sitting." Id. He could only "occasionally stoop, crouch,

crawl and kneel, occasionally climb ramps or stairs, and could never climb ladders, ropes, or scaffolds." Id.  The ALJ further found that Mitchell was limited to work that required acute vision on the right side and ought to avoid contact with workplace hazards.  Id.  Lastly, the ALJ ascertained that Mitchell could be in a "low-stress job" that frequently required "reach[ing] overhead bilaterally." Id.

At step four, the ALJ accounted for Mitchell's age, education, work experience and RFC to find that he could not perform his past work as a delivery driver and truck mechanic.  R. at 18-19.

At step five, however, the ALJ found that Mitchell could perform the jobs of call-out operator, surveillance system monitor and information clerk, all of which exist in significant numbers in the national economy.  R. at 19-20.  Accordingly, the ALJ found that Mitchell was not disabled.  R. at 20.

### C.   Mitchell's Challenges to the ALJ's Findings

#### 1.   The ALJ did not err in evaluating medical evidence of depression

Mitchell's first challenge to the ALJ's findings is that the ALJ erred in ignoring the only medical opinions evaluating his depression.  D. 16 at 3.  Specifically, Mitchell disputes the consideration—both the level and detail—that the ALJ gave to a Disability Determination Review Form ("disability review form") completed at the University of Massachusetts Medical School Disability Evaluation Services ("DES") on February 7, 2014.  Id.; R. at 704-11.  This form was generated in connection with Mitchell's application for the Emergency Aid to the Elderly, Disabled, and Children Program ("EAEDC") which is administered by the Massachusetts Department of Transitional Assistance ("DTA").  R. at 704-11.  The record also includes a letter

dated February 11, 2014 from DES deciding he had a disability expected to last through August 7, 2014 for purposes of his EAEDC application ("decision letter").  R. at 703.

The Social Security regulations require the ALJ to "evaluate all the evidence in the case record that may have a bearing on [the] determination or decision of disability, including decisions by other governmental and nongovernmental agencies."  SSR 06-03P (S.S.A. Aug. 9, 2006) (citing 20 C.F.R. § 404.1512(b)(5); § 416.912(b)(5)).  Although the ALJ did not explicitly mention the disability review form's underlying medical opinions (i.e., that Mitchell's depression resulted in "deficiencies of concentration, persistence or pace"), R. at 71, "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party."  N.L.R.B. v. Beverly Enterprises-Massachusetts, Inc., 174 F.3d 13, 26 (1st Cir. 1999).  Here, the ALJ directly referenced "the EAEDC letter opining that the claimant is disabled due to back pain and depression" and cited Exhibit B7F which contains both the disability review form and the decision letter.  R. at 18.  The Court, therefore, concludes that the ALJ sufficiently considered both documents.

Mitchell alternatively argues that even if the ALJ considered the disability review form and decision letter, the ALJ erred in rejecting this evidence and assigning it "less weight."  D. 16 at 3. Under the Social Security regulations, the final responsibility of making a disability determination is reserved for the Commissioner.  20 C.F.R. § 404.1527.  The regulations further state that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  Id.  Thus, the ALJ was neither required to accept the EAEDC's conclusion that Mitchell was disabled due to back pain and depression nor give "any special significance" to the reviewers' underlying opinions.  See id.

Furthermore, as the ALJ noted, the standard used to make a disability finding for EAEDC purposes does not align with the SSA standard. R. at 18.  It is "well established that the standard employed for benefits under EAEDC 'is less strict than that required for Social Security benefits because an applicant is not required to show that she is totally disabled.'" Nelson v. Colvin, No. CIV.A. 14-10254-JGD, 2015 WL 1387864, at *11 (D. Mass. Mar. 25, 2015) (quoting Tolentino v. Astrue, No. 09–11093–RGS, 2010 WL 1633484, at *4 n.7 (D. Mass. Apr. 21, 2010)).  It was therefore "entirely appropriate" for the ALJ to give little weight to the DTA's conclusion that the claimant was "disabled" and the physician's reports used to determine the claimant's EAEDC eligibility.  Id.  The Court does not find that the ALJ erred in assigning "less weight" to the disability review form and decision letter when he evaluated Mitchell's depression.[4]

Mitchell further maintains that since the ALJ did not rely sufficiently on the disability review form and decision letter, the ALJ must have relied on his own lay opinion to assess Mitchell's functional limitations and to determine that he is capable of low-stress work.  D. 16 at 5.  It is well-settled that the ALJ is "not at liberty to ignore medical evidence or substitute his own

---

[4] The Court also notes that the medical opinions in the disability review form at issue were expressed in a checklist format and opinions in this format are typically afforded less weight.  R. at 740-41; see Arruda v. Barnhart, 314 F. Supp. 2d 52, 71–73 (D. Mass. 2004) (holding that less weight was warranted for a treating physician's physical capacity evaluation form that was "a brief list of checked answers to form questions unaccompanied by an explanation"); see also 20 C.F.R. §§ 404.1527(d)(3) & 416.927(d)(3) (stating that "[t]he better an explanation a source provides for an opinion, the more weight we will give to that opinion"); Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991) (holding that reports "contain[ing] little more than brief conclusory statements or the mere checking of boxes denoting levels of residual functional capacity . . . are entitled to relatively little weight"); Mason v. Shalala, 994 F.2d 1058, 1065 (3rd Cir. 1993) (holding that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best").

views for uncontroverted medical opinion." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). Here, the ALJ did not disregard the EAEDC's findings, but merely assigned them "less weight" as was squarely within his discretion for the reasons the Court has explained above.

Furthermore, the disability review form and the decision letter were not the only documents in the record that pertained to his concentration, persistence and pace.  Rather, as the Commissioner points out, such information was also available through Mitchell's consultative psychological exam with Jay A. Koslof, PsyD and through Mitchell's own testimony. D. 20 at 11.  Specifically, Dr. Koslof noted that "with regard to [Mitchell's] memory and concentration, there were some suggestions of short term memory impairment, as well as a loss of focus at times." R. at 94.  In addition, Mitchell testified that "he is unable to even focus on watching television." R. at 13.  The ALJ explicitly took Dr. Koslof's opinions along with Mitchell's statements into account in finding that Mitchell has "moderate difficulties with regard to concentration, persistence or pace" and this information constitutes substantial evidence.  Id.; see Arruda, 314 F. Supp. 2d at 79-80 (finding substantial evidence for ALJ's determination that claimant suffered moderate limitations with respect to concentration, persistence or pace because it was corroborated by doctors' reports). Accordingly, the ALJ did not erroneously supplant the medical evidence with his own lay opinion to determine Mitchell's functional limitations.[5]

---

[5] Mitchell additionally argues that the ALJ inadequately explained low-stress work when posing hypotheticals to the VE and relies upon Lancelotta v. Sec'y of Health & Human Servs., 806 F. 2d 284, 285 (1st Cir. 1986), for support.  D. 16 at 5-6.  However, as the Commissioner points out, the ALJ here, unlike in Lancellotta, did not merely conclude and posit to the VE that Mitchell required a low-stress job.  D. 20 at 12; see Degraffenreid v. Colvin, No. 15-civ-10185-ADB, 2016 WL 5109509, at *8 (D. Mass. Sept. 20, 2016); Justason v. Barnhart, No. 05-55-P-C, 2005 WL 3263934, at *5 (D. Me. Nov. 30, 2005)).  Rather, as required, the ALJ made findings regarding the nature of Mitchell's stress, the circumstances that evoke it and how those factors impact his work abilities

> 2.    *The ALJ did not err in his treatment of Mitchell's April 2014 MRI results*

Mitchell's second challenge to the ALJ's findings is that the ALJ erred when evaluating his MRI results from an examination conducted on April 21, 2014 at the BMC.  D. 16 at 6-7; R. at 551-52.  Mitchell identifies the findings at L4-L5 as particularly relevant to his disability claim, namely, that "there is crowding of the subarticular recess of [sic] with impingement of the traversing L5 nerve roots."  D. 16 at 6; R. at 552.  The MRI also showed mild or insignificant degenerative changes and narrowing at L2-L3 and L3-4.  R. at 551.

Mitchell first argues that the ALJ ignored the MRI finding of "impingement of the traversing L5 nerve roots"  when referring to his back impairment as "lower back strain" at step two of SSA's five-step sequential evaluation process.  D. 16 at 6.  In support of this argument, Mitchell directs the Court's attention to the fact that the SSA consultative reports characterize his back impairment as "lower back strain" and these reports pre-date the April 2014 MRI findings.  Id. at 6-7.  However, even if "impingement of the traversing L5 nerve roots" is not roughly equivalent to "lower back strain," the ALJ still concluded that this impairment was severe at step two based upon the available medical evidence, including the MRI findings.  See R. at 11 (finding "lower back strain" severe at step two based on "[t]he medical evidence of record, discussed below"); R. at 16 (discussing April 21, 2014 MRI).

Once deemed severe, an impairment must meet or equal a listing in 20 C.F.R. § 404, Subpart P, Appendix 1.  The way that an ALJ labels an impairment at step two thus has little

---

when limiting him to "only occasional decision-making and occasional changes in the work setting" and no "production rate or pace work."  R. at 13; R. at 65; R. at 67-68; see Degraffenreid, 2016 WL 5109509, at *8; Justason, 2005 WL 3263934, at *5.

bearing on the ultimate finding of whether a claimant is disabled and merely serves as a starting point for identifying the relevant listings.  See White v. Astrue, No. CIV.A. 10-10021-PBS, 2011 WL 736805, at *6 (D. Mass. Feb. 23, 2011) (recognizing that "[a] mere diagnosis of a condition 'says nothing about the severity of the condition'" (quoting Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir.1988)).  Neither "lower back strain" nor "impingement of the traversing L5 nerve roots" are explicitly listed in Appendix 1 of the Social Security regulations but rather, are both encompassed in the musculoskeletal listings in 1.00 which the ALJ identified as relevant at step three.  R. at 11.  Therefore, the Court does not find that ALJ's reference to Mitchell's back impairment as "lower back strain" was in error.

Mitchell additionally contends that the ALJ did not adequately consider his recent MRI results when determining whether his condition met or equaled listing 1.04, "Disorders of the spine."  D. 16 at 6.  At step three of SSA's five-step sequential evaluation process, "it is the claimant's burden to show that he has an impairment or impairments which meets or equals a listed impairment in Appendix 1" of the Social Security regulations.   20 C.F.R. § 416.920; Torres v. Sec'y of Health & Human Servs., 870 F.2d 742, 745 (1st Cir. 1989).  If this burden is met, then the claimant is found disabled regardless of age, education or work experience. 20 C.F.R. § 404.1520; Arrington v. Colvin, No. CV 15-10158-JGD, 2016 WL 6561550, at *10 (D. Mass. Nov. 3, 2016). "An impairment meets the listings only when it manifests the specific findings described in the set of medical criteria for a particular listed impairment." Martinez Nater v. Sec'y of Health & Human Servs., 933 F.2d 76, 77 (1st Cir. 1991) (quotations and citation omitted). "An impairment equals a listed impairment when the set of symptoms, signs and laboratory findings in the medical evidence supporting the claimant are at least equivalent in

15

severity to the set of medical findings for the listed impairment." Martinez Nater, 933 F.2d at 77 (quotations and citation omitted); see Arrington, 2016 WL 6561550, at *10.

There is disagreement among courts as to the level of detail the ALJ must provide when explaining whether the claimant's severe impairments meet or equal a listing. See Arrington, 2016 WL 6561550, at *10; Medina–Augusto v. Comm'r of Soc. Sec., No. 14-CV-1431-BJM, 2016 WL 782013, at *8 (D.P.R. Feb. 29, 2016). The First Circuit has not yet prescribed a uniform rule to govern this matter and courts in this district appear to have come to different conclusions regarding same. Arrington, 2016 WL 6561550, at *10; compare Arsenault v. Astrue, 937 F. Supp. 2d 187, 189 (D. Mass. 2013) (remanding because the ALJ failed to "actually evaluate the evidence, compare it to . . . the Listing, and give an explained conclusion"), with Rivera v. Barnhart, No. 04-CV-30131–KPN, 2005 WL 670538, at *5 (D. Mass. Mar. 14, 2005) (denying motion to remand on the grounds that "the failure – if failure it is – to make specific findings as to whether a claimant's impairment meets the requirements of a listed impairment is an insufficient reason in and of itself for setting aside an administrative finding"). This disagreement does not pose a problem in this case because the Court finds that the ALJ sufficiently considered Mitchell's recent MRI results at step three even under a stricter standard articulated, for example, in Arsenault v. Astrue.

Unlike in Arsenault, where the ALJ completely overlooked a relevant listing, 937 F. Supp. 2d at 189, the ALJ here considered whether Mitchell's back impairment met or equaled the relevant listings in 1.00, including 1.04. R. at 11. The ALJ proceeded to "evaluate the evidence" and "compare it . . . to the Listing" in stating that "no treating source or examining physician has proffered findings that meet or medically equal the listings considered . . . ." R. at 11; see

Arsenault, 937 F. Supp. 2d at 189.  The ALJ also explained his conclusion as consistent with the opinions of the state agency medical consultants.  R. at 11.  Although the ALJ did not explicitly reference Mitchell's recent MRI results in his discussion at step three, "[w]e read the opinion as a whole."  Knapp v. Sec'y of Health & Human Servs., 810 F.2d 315, 316 (1st Cir. 1987).  The ALJ devoted attention to the MRI results in his discussion at step four specifically stating that "[w]hile the claimant's most recent MRI demonstrate[s] moderate to severe degenerative change, the claimant's back disorder is not disabling."  R. at 17.  Upon considering the ALJ's decision in its entirety, the Court finds that substantial evidence supports his determination that Mitchell's back impairment did not meet or equal listing 1.04.

Mitchell further claims that the ALJ should have requested a new consultative examination in light of his recent MRI results.  D. 16 at 7.  However, the First Circuit has held that "remand is appropriate only where the court determines that further evidence is necessary to develop the facts of the case fully, that such evidence is not cumulative, and that consideration of it is essential to a fair hearing."  Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139–40 (1st Cir. 1987); see Scott v. Califano, 462 F. Supp. 240, 242 (N.D. Ill. 1978).  Here, like the record the First Circuit found sufficient in Evangelista, Mitchell's record was "voluminous, detailed, and complex" as it contained hundreds of pages of medical records from a number of different sources. Evangelista, 826 F.2d at 140.  The ALJ's conclusion was based upon multiple medical opinions that were largely consistent.  See, e.g., R. at 14 (relying on a February 15, 2012 x-ray of the lumbar spine revealing no acute fractures or subluxations); R. at 16 (relying on an October 7, 2013 x-ray showing "minimal degenerative change of the lumbar spine, characterized by facet hypertrophy at L4-5, L5-S1" and April 21, 2014 x-ray showing "moderate to severe degenerative changes at the

L3-L4 level"); <u>see also</u> <u>Colon v. Colvin</u>, No. 15-14547, 2016 WL 4727993, at *3 (11th Cir. Sept. 12, 2016) (finding that the ALJ did not err by not requesting additional consultative examinations because the record contained "numerous medical opinions that were largely in accord").  The MRI results did not indicate a new condition and, consequently, an additional consultative exam would be for the same condition that had already been evaluated multiple times.  <u>See</u> R. at 16; <u>Colon</u>, 2016 WL 4727993, at *3.  As a result, the Court does not conclude that the ALJ erred in issuing his decision without ordering additional consultative examinations.

3.      <i>The ALJ did not err in relying on the VE's testimony</i>

Mitchell's third challenge to the ALJ's findings is that the ALJ erroneously relied on the VE's opinion that he could perform the jobs of call-out operator (DOT 237.367-014), surveillance system monitor (DOT 379.367-010) and information clerk (DOT 237.367-022) as described in the Dictionary of Occupational Titles ("DOT").  D. 16 at 7-8.  The ALJ determined that Mitchell is precluded from occupations that require acute vision on the right side because "the medical evidence of record shows that he has decreased baseline vision in the right as the result of a motorcycle crash."  R. at 14.  The ALJ took Mitchell's vision into account when posing hypotheticals to the VE, specifically stating that the individual could not have "an occupation that requires acute vision and particularly on the right side."  R. at 65.  Mitchell claims that the VE's testimony conflicted with the DOT because all three jobs that the VE identified are listed in the DOT as frequently requiring "near acuity," meaning "clarity of vision at 20 inches or less," from one-third to two-thirds of the time.  D. 16 at 8; R. at 19-20 (error in citing DOT 237.267-022 for information clerk); DOT 237.367-014; DOT 379.367-010; DOT 237.367-022; Medical-Vocational Quick Reference Guide, SSA POMS DI 25001.001 ¶ 48.

18

Social Security Ruling 00–4p requires that, "when vocational evidence provided by a [VE] is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the [VE] evidence to support a determination or decision that the individual is or is not disabled." 2000 WL 1898704, at *4 (S.S.A. Dec. 4, 2000). The ALJ, however, is only obligated to explain these conflicts if they are "apparent" and "identified." Aho v. Comm'r of Soc. Sec. Admin., No. 10-CV-40052-FDS, 2011 WL 3511518, at *14 (D. Mass. Aug. 10, 2011); see SSR 00-4p, 2000 WL 1898704, at *2, *4.

Mitchell assumes that the ALJ's conclusion that he does not have "acute vision" is equivalent to the conclusion that his vision is not "near acuity." D. 16 at 7-8. The Court does not make the same assumption because 'acute vision' is not one of the six functional, visual limitations recognized in the Physical Residual Functional Capacity Assessment ("PRFCA"): near acuity, far acuity, depth perception, accommodation, color vision and field of vision. See R. at 94; R. at 122; Aho, 2011 WL 3511518, at *8. Since the ALJ did not translate Mitchell's visual limitations into one of the six listed functional limitations, it has not been shown that his visual capabilities were incompatible with the requirements of the jobs that the VE returned.[6] See R. at 13; Aho, 2011 WL 3511518, at *8, *15 (finding conflict not apparent because ALJ's hypothetical did not translate the limitations resulting from claimant's right-eye blindness in terms of one of the six

---

[6] Mitchell neither contends that the ALJ erred in identifying his visual limitation in terms of "acute vision" rather than one listed in the PRFCA, nor that the ALJ should have instead described it as limited depth perception in the right eye in accordance with his PRFCA. See R. at 94; R. at 122. However, even if this argument were raised the Court notes that none of the three jobs that the VE returned require unlimited depth perception. See DOT 237.367-014, 379.367-010, 237.367-022.

listed functional limitations in the PRFCA).  Accordingly, the Court finds that the ALJ was not required to address the alleged conflict between the VE's testimony and the DOT.[7]

Even if the alleged conflict were apparent, it was not identified within the proper timeframe and any objection to it was therefore waived.  Although Ruling 00-4p requires the ALJ to address a conflict "irrespective of how the conflict was identified," SSR 00-4p, 2000 WL 1898704, at *4, other courts in this district have not construed this language as requiring an ALJ to explain a conflict that went unnoticed during the administrative hearing.  See Aho, 2011 WL 3511518, at *14; Corcoran v. Astrue, No. 09-CV-30230-KPN, 2011 WL 2023292, at *7 (D. Mass. Apr. 25, 2011); Pires v. Astrue, 553 F. Supp. 2d 15, 25-26 (D. Mass. 2008); see also Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002).  Here, Mitchell did not point out the alleged conflict between the VE's testimony and the DOT during the administrative hearing and, as a result, the ALJ was not required to address it.  See Aho, 2011 WL 3511518, at *14; Corcoran, 2011 WL 2023292, at *7; Pires, 553 F. Supp. 2d at 25-26; see also Donahue, 279 F.3d at 446.

Mitchell additionally argues that the ALJ erred in relying upon the VE's testimony because the ALJ's hypothetical failed to specify how long the individual could be required to stand while working.  D. 16 at 9.  While the hypothetical in question reflects the ALJ's determination that Mitchell's RFC limits him to work that allows for the option to stand after 20 to 30 minutes of sitting, it does not explicitly identify the time period that Mitchell would need to be allowed to

---

[7] It is not clear that there was a conflict between the VE's testimony and the DOT.  For each occupational title, the DOT lists the functional limitations set forth in the PRFCA and identifies whether that functional ability is required.  Since acute vision is not one of the functional, visual limitations listed in the PRFCA, the descriptions for call-out operator, surveillance system monitor and information clerk do not identify whether acute vision is required.  See DOT 237.367-014, 379.367-010, 237.367-022.  Although these occupations do require near acuity, the Court notes that Mitchell's PRFCA found his vision "unlimited" in terms of near acuity.  R. at 94; R. at 122

stand.  See R. at 13; R. at 66-67.  Mitchell claims that this is an error that requires remand.  D. 16 at 9.

In support of his claim, Mitchell directs the Court's attention to a line in Social Security Ruling 96-9p:  where the ALJ determines that an individual requires a sit/stand option at work, the ALJ's RFC assessment "must be specific as to the frequency of the individual's need to alternate sitting and standing."  D. 16 at 10; SSR 96-9p, 1996 WL 374185, at *7 (S.S.A. July 2, 1996).  In other words, the ALJ must indicate how often the claimant must be allowed to stand after sitting. See SSR 96-9p, 1996 WL 374185, at *7.  It does not, however, require the ALJ to mention how long the claimant be permitted to stand.  See id.  The ALJ thus complied with this portion of Ruling 96-9p when specifying the frequency at which Mitchell needed the opportunity to stand: after 20 to 30 minutes of sitting.

Mitchell additionally cites Social Security Ruling 83-12 in arguing that the ALJ erred in neglecting to indicate how long he could stand while working.  D. 16 at 9.  Under this ruling, a VE "should be consulted to clarify the implications for the occupational base" when an ALJ imposes a sit/stand option.  SSR 83-12, 1983 WL 31253, at *4 (S.S.A. Jan. 1, 1983).  Like Ruling 96-9p, this ruling does not require that the ALJ specify the amount of time that the claimant is capable of standing at work.  See id.; see also Aho, 2011 WL 3511518, at *11 (finding that "no circuit court has required [this level of] specificity . . . concerning the sit/stand option where a claimant has been found capable of performing light exertional work"); Henderson v. Soc. Sec. Admin., 87 F. App'x 248, 252 (3d Cir. 2004) (finding hypothetical merely stating that an individual capable of light work "would need an opportunity to alternate sitting and standing" was adequate); Walls v. Barnhart, 296 F.3d 287, 290-91 (4th Cir. 2002) (finding hypothetical adequate even though

"ALJ made no specific findings regarding the effect of the sit/stand provision" on individual capable of light work).  The ALJ in this case consulted a VE to determine what jobs were available that entailed only light work and allowed a sit/stand option, thereby adhering to Ruling 96-9p.

## V.    Conclusion

For the foregoing reasons, Mitchell's motion to reverse is DENIED and the Commissioner's motion to affirm is GRANTED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

22